**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**VALERIE K. SMITH**

        **Plaintiff,**

**v.**                               **Civil Action No.: 2:10-CV-123**
                                               **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18], AND AFFIRM THE RULING OF THE COMMISSIONER**

## I. INTRODUCTION

On November 4, 2010, Plaintiff Valerie K. Smith ("Plaintiff"), by counsel James T. Carey, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1) On January 13, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 9; Administrative Record, ECF No. 10) On March 14, 2011, and April 6, 2011, the Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J., ECF

No. 16; Def.'s Mot. for Summ. J., ECF No. 18)  Following review of the motions by the parties and administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On September 19, 2007, the Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), and a Title XVI claim for supplemental security income ("SSI"), alleging disability beginning November 1, 2003.  (R. at 10, 148-155)  Her claims were initially denied on February 14, 2008, and denied again upon reconsideration on July 7, 2008.  (R. at 10, 91-104, 106-111)  On July 28, 2008, the Plaintiff filed a written request for a hearing, which was held in Wheeling, West Virginia, before a United States Administrative Law Judge ("ALJ") on September 1, 2009.  (R. at 10, 33-90, 113, 116-143)  The Plaintiff, represented by James T. Carey, esquire, appeared and testified at the hearing along with her roommate, Philip Lyons.  (R. at 10)  Eugene A. Czuczman, an impartial vocational expert, also appeared and testified at the hearing.  Id. Also on the date of the hearing, the Plaintiff amended her alleged onset date to February 7, 2007.  (R. at 147)[1]  On November 23, 2009, the ALJ issued an unfavorable decision to the Plaintiff, finding that she was not disabled within the meaning of the Social Security Act.  (R. at 10-24)  On

---

[1] As noted by the ALJ and conceded by the Plaintiff at the ALJ hearing and in her brief, the amended onset date of February 7, 2007, prevents the Plaintiff from meeting the insured status requirements under Title II.  (R. at 10, 39; see also Pl.'s Mem. in Supp. of Mot. for Summ. J. 1, ECF No. 17)  Accordingly, the Plaintiff, prior to the issuance of the ALJ's decision, effectively withdrew her Title II claim for DIB and has instead proceeded solely on her Title XVI application for SSI.

September 8, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-4) The Plaintiff now requests judicial review of the ALJ decision denying her applications for disability.

B.     Personal History

Valerie K. Smith was born May 23, 1964, and was 43 years old at the time she applied for DIB and SSI. (R. at 148) She completed the 10th grade of high school, and has prior work experience as a laborer and waitress. (R. at 198, 201, 211) She was previously married, but is currently single and living with a roommate. (R. at 149, 196)

C.     Medical History[2]

On February 7, 2007, the Plaintiff visited Dr. Christopher Kubicki, M.D., for a new patient evaluation. (R. at 272-74, 359-60) She reported living at home with her fiancee. (R. at 274) She reported smoking more than a pack per day of cigarettes since age 12, no alcohol or drug use, and drinking 20 ounces of coffee and 1 bottle of tea daily. Id. Dr. Kubicki noted that she appeared anxious, and needed something for her nerves because her son had just died of a drug overdose and her other son was in prison for drugs. (R. at 272, 359) He also noted that she was taking three Xanax per day. (R. at 272, 359) Dr. Kubicki diagnosed her with anxiety, prescribing Buspar and Xanax. (R. at 273, 360) A doctor's note from February 16, 2007, states that the Plaintiff did not think that the Buspar was helping due to the side effects, but that the Xanax was helping her. (R.

_____

[2] The Plaintiff has only challenged the ALJ's decision insofar as it relates to her mental impairments. Accordingly, this Report and Recommendation will only focus on evidence relating to the Plaintiff's mental status and social functioning.

at 268)

The Plaintiff visited Dr. Kubicki on July 24, 2007, for an evaluation of her anxiety. (R. at 271, 358) At that time, she was very anxious and had insomnia, but denied clear-cut depression. (R. at 271, 358) She was taking one or two Xanax per day on occasion, and had started grief counseling at church due to the death of her 24-year-old son and the imprisonment of her 22-year-old son. (R. at 271, 358) Dr Kubicki diagnosed her with an anxiety neurosis and insomnia relating to that neurosis, and prescribed her to continue taking Xanax. (R. at 271, 358) He also noted that he had a long discussion with the Plaintiff about using Xanax judiciously and only as needed. (R. at 271, 358)

The Plaintiff visited Dr. Kubicki on October 4, 2007, for a followup. (R. at 270, 361) Dr. Kubicki wrote that the Plaintiff had mental problems, caused by excitable thoughts in her mind relating to the death of one son and the imprisonment of the other. (R. at 270) He also wrote that she has a lot of anxiety regarding her home situation, but really does not have any other problems. (R. at 361) Dr. Kubicki diagnosed her with an anxiety neurosis and questionable depression. Id. A medication log shows that Dr. Kubicki renewed the Plaintiff's Xanax prescription. (R. at 269)

The Plaintiff visited Dr. Kubicki on December 18, 2007, for a followup. (R. at 357) He noted that the Plaintiff was feeling a little bit better regarding her anxiety, and although she had some mood swings she did not seem to be overly depressed. Id. He further noted that she had seen a psychologist a few days before and had a followup appointment, which she liked; he diagnosed her with anxiety neurosis and questionable depression. Id.

Dr. Joseph Shaver, M.D., a state agency medical consultant specializing in psychology, completed a case analysis form on December 20, 2007, stating that an updated mental status evaluation was needed before he could assess the Plaintiff's disability claim. (R. at 275)

On January 15, 2008, the Plaintiff visited Dr. Robert Walker, Ed.D., a psychologist, for treatment. (R. at 347) Dr. Walker's progress note states that the Plaintiff visited him for help coping with the death of her son. Id. She reported becoming very tearful when she thinks of her son's death, and also reported worrying about her other son who she thought might end up with the same type of drug problem. Id. She did state that she is feeling better after increasing medication for her hypothyroid problem, decreasing her caffeine consumption, and making efforts to keep herself busy. Id. Dr. Walker diagnosed her with an adjustment disorder with mixed anxiety and depressed mood, and advised her to continue activities and Xanax medication as tolerated. Id.

On January 21, 2008, Dr. Anthony Golas, Ph.D, a psychologist from Steubenville Ohio, performed an adult mental profile evaluation of the Plaintiff. (R. at 276-84) Dr. Golas performed the following psychological assessments:

• Wechsler Adult Intelligence Scale – Third Edition (WAIS-III);

• Wide Range Achievement Test – Third Revision (WRAT-3);

• Beck Depression Inventory – II (BDI-II);

• Mental Status Examination; and

• Clinical Interview

(R. at 276) Dr. Golas began his evaluation by observing that the Plaintiff was appropriately dressed, her hygiene was appropriate, was driven to the evaluation by a friend but arrived alone, completed

her own paperwork, and served as the principal source of the information in the evaluation. Id. The Plaintiff complained of thyroid problems, depression, and anxiety. Id. She reported having grief since the death of her son, as well as lifelong anxiety issues and problems being around people. (R. at 277) She stated that she suffers from fear, anxiety, irritation, hot flashes, hair loss, and grief over the death of her son. Id. She also reported that she was sad, hopeless, anhedonic, self-critical, restless, agitated, and irritable. Id. She had a hard time getting interested in anything, had trouble making decisions and concentrating, felt worthless, experienced fatigue, slept a lot more than usual, had racing thoughts, worried a lot, and was stressed. Id. She drank beer on a weekly basis between the ages of fifteen and forty-two, stopping when her son died. (R. at 278) She also reported smoking marijuana between the ages of sixteen and seventeen, and having a public intoxication charge from 1998. Dr. Golas noted that the Plaintiff was marginally cooperative and responsive to questions about her attitude and behavior; generally responsive to questions about her social skills; generally coherent and average in her speech; and oriented to person, place, time, and date, but not situation. (R. at 279-80) Her thought processes were intact with no observable impairments or deficits; she showed no evidence of delusions, preoccupations, obsessions, or phobias; she neither reported nor displayed evidence of illusions, hallucinations, or depersonalization; her insight was fair; her judgment was average based on her comprehension score on the WAIS-III; her remote memory was mildly deficient but her immediate and recent memory were normal; her concentration, as based on her working memory score on the WAIS-III, was normal, and her psychomotor behavior was normal. (R. at 280-81) She did, however, report that she had thoughts of killing herself but would not carry them out. (R. at 280) Dr. Golas noted that the Plaintiff's social functioning during

the evaluation, based on her interaction with the office staff, was within normal limits. (R. at 284) Dr. Golas found that the Plaintiff's responses on the BDI-II and the Burns Anxiety Inventory yielded scores considered to be in the extreme range for depression and anxiety, but reported that his observations showed the Plaintiff's anxiety to be mild and appropriate to the setting and circumstances of the evaluation. (R. at 280, 283) Dr. Golas diagnosed the Plaintiff with generalized anxiety disorder and major depressive disorder, recurrent, moderate. Id. His prognosis, based on the examination and interview, was fair. Id.

The Plaintiff visited Dr. Walker on February 5, 2008, for a checkup. (R. at 346) The Plaintiff reported taking her medication as needed, but still having difficulty coping with her son's death, which was approaching the one-year anniversary. Id. She continued to feel depressed and avoided going out in public, and was worried about her boyfriend's health. Id. Dr. Walker maintained his diagnosis of an adjustment disorder with mixed anxiety and depressed mood, and recommended she continue with her medication and go out at least three times per week. Id.

On February 14, 2008, Dr. Shaver completed a psychiatric review technique form, assessing the Plaintiff from December 31, 2004 through the date of the review. (R. at 285-98) Dr. Shaver found that the Plaintiff had symptoms of major depressive disorder under Listing 12.04 Affective Disorders and generalized anxiety disorder under Listing 12.06 Anxiety-Related Disorders. (R. at 288, 290) However, he also found that neither of these disorders were severe impairments because her impairments did not restrict her activities of daily living; did not affect her social functioning; did not cause her difficulty in maintaining concentration, persistence, or pace; and did not cause any episodes of decompensation of an extended duration. (R. at 285, 295) Additionally, he found that

neither of her disorders satisfied the "C" criteria of the listings. (R. at 296) Dr. Shaver remarked that the Plaintiff was generally credible regarding her reported mental functioning, but that her daily activities, social functioning, and concentration fell within normal levels. (R. at 297) He opined that the Plaintiff had the mental capacity to maintain gainful employment on a sustained basis. Id. He also noted that there was insufficient evidence for an evaluation prior to December 31, 2004, the date last insured. Id.

The Plaintiff visited Dr. Kubicki on March 17, 2008, for a followup. (R. at 309, 354) He reported that she was doing fairly well other than her anxiety, diagnosing her with an anxiety neurosis. (R. at 309, 354)

The Plaintiff visited Dr. Walker on March 25, 2008. (R. at 345) She continued to take her Xanax prescription, and reported that her primary care physician, Dr. Kubicki, had increased her thyroid medication following some blood work. Id. She was upset because her son had recently been arrested for purchasing heroin, and she was afraid he would be sentenced to a long jail sentence. Id.

The Plaintiff visited Dr. Walker again on April 15, 2008. (R. at 344) She continued to worry about the fate of her youngest son, who will likely be going to prison over purchasing illegal drugs. Id. She still had not gotten over the death of her oldest son who died due to a drug overdose. Id.

The Plaintiff visited Dr. Kubicki on April 29, 2008, for a checkup. (R. at 307-08, 350-51) He noted that the Plaintiff has mood swings, nightmares, anger problems due to her son's death, and occasional thoughts of suicide or homicide. (R. at 307, 350)

On May 12, 2008, the Plaintiff visited Dr. Walker, reporting that she had obsessive compulsive disorder. (R. at 343) Dr. Walker noted, however, that she had never indicated any compulsive behaviors in the past. Id. He also noted that Dr. Kubicki had prescribed Luvox to help control her symptoms. Id. She continued to report depression due to the death of her oldest son and criminal trouble of her youngest son. Id. Dr. Walker changed his diagnosis to include obsessive-compulsive disorder, and recommended the Plaintiff continue on her medication and activities as tolerated. Id.

Dr. Walker treated the Plaintiff on June 2, 2008. (R. at 342) She reported getting some relief from the Luvox, and stated that she continued to take Xanax. Id. Although she was sleeping better, she was still unable to sleep 7-8 hours per night. Id. She stated that she continues to go through rituals prior to leaving her house, and that she was very depressed due to the death of her oldest son and the potential of a twenty year sentence for her younger son. Id.

The Plaintiff visited Dr. Kubicki on June 10, 2008. (R. at 348) He noted that the Plaintiff had obsessive-compulsive disorder, was checking things multiple times, and was seeing Dr. Walker for treatment. Id. He further noted that she was doing okay with treatment. Id. He diagnosed her with anxiety, depression, obsessive-compulsive disorder, and upped her Luvox dosage. (R. at 349)

The Plaintiff visited Dr. Walker for a checkup on June 16, 2008. (R. at 341) She reported that she was taking Luvox daily and was getting some relief from her depression, but still had significant compulsive behaviors. Id. She stated that she was doing somewhat better coping with the death of her son, and was somewhat relieved to find out that her son would likely receive five instead of twenty years incarceration. Id. She continued to report significant anxiety. Id.

On June 23, 2008, Dr. Bob Marinelli, Ed.D., a state agency medical consultant, completed a mental Residual Functional Capacity ("RFC") assessment of the Plaintiff. (R. at 312-15) Dr. Marinelli found that the Plaintiff had moderate limitations in her ability to remember locations and work-like procedures and understand and remember detailed instructions, but no significant limitation in her ability to understand and remember short and simple instructions. (R. at 312) He found no evidence of limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; and that she had no limitation in her ability to carry out short and simple instructions, sustain an ordinary routine without special supervision, work in coordination or proximity of others without being distracted by them, and make simple work decisions. Id. He did find that she was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. Id. He found moderate limitation in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 313) She was not significantly limited in her ability to ask simple questions or request assistance, or her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, but had moderate limitation in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Id. She had moderate limitation in her ability to respond appropriately to changes in the work setting, and no significant limitation in her ability to be aware of normal hazards, travel in unfamiliar places or use public transportation, or set realistic goals or

make plans independently of others.  Id.  Overall, Dr. Marinelli assessed the Plaintiff's RFC as reduced by moderate limitations in memory, concentration, sustained persistence, social functioning, and adapting to change.  (R. at 314)  She did, however, have the capacity for routine competitive employment involving short and simple instructions in an environmental with low pressure, social, and adaptive demands.  Id.

Also on June 23, 2008, Dr. Marinelli completed a psychiatric review technique form, evaluating the Plaintiff's mental impairments from November 1, 2003 through the date of the evaluation.  (R. at 316-29)  Dr. Marinelli found that the Plaintiff suffered from major depressive disorder and generalized anxiety disorder.  (R. at 319, 321)  He determined that she suffered from a moderate degree of limitation in her activities of daily life; social functioning; and concentration, persistence, or pace.  (R. at 326)  He found that she had no episodes of decompensation of an extended duration, and found that neither of her impairments met the "C" criteria of the listings.  (R. at 326-27)  Dr. Marinelli found that the Plaintiff appeared credible because her reports were consistent with the medical evidence of record.  (R. at 328)  He also noted that there was insufficient evidence prior to the date last insured.  Id.

Dr. Thomas Lauderman, D.O., a state agency medical consultant, completed a physical RFC assessment of the Plaintiff on July 3, 2008.  (R. at 330-37)  Dr. Lauderman left the majority of the assessment blank, noting that the claimant's adult function report stated that she can perform a full range of daily activities and that her reported difficulties were mental.  (R. at 335)  He also noted that there was insufficient medical evidence prior to the date last insured.  (R. at 337)

On August 4, 2008, Dr. Walker wrote a letter to the Plaintiff's counsel, stating that the

Plaintiff had originally sought his services for treatment of depression and anxiety but that during the course of treatment it was clear she also suffered from severe obsessive compulsive disorder. (R. at 340) Dr. Walker described her obsessive compulsive disorder as being particularly resistant to medication and generally a lifelong condition. Id.

On August 27, 2008, the Plaintiff visited Dr. William Price for an initial psychiatric evaluation. (R. at 402-05) She informed Dr. Price that she was trying to get social security disability and reported significant OCD and depression. (R. at 402) She stated that her OCD started as a teen, but got worse when her son died in 2007. Id. She gets up at 2AM and cleans all day, repeats herself, constantly touches and checks on things, and needs to leave her home early to be on time. Id. Dr. Price diagnosed the Plaintiff with OCD based around germ phobia and hand washing, and prescribed her Xanax and Luvox for her symptoms. Id.

The Plaintiff visited Dr. Walker on August 29, 2008. (R. at 387) Dr. Walker's notes state that the Plaintiff was medication compliant, but decided she would go back to her original dose of Luvox because the increased dosage prescribed by Dr. Price made her sleep too long. Id. She continued to report significant depression over the death of her son, as well as compulsive behaviors such as counting things and worrying about germs and bacteria. Id.

Dr. Price treated the Plaintiff on September 17, 2008. (R. at 401) Dr. Price noted that she still checks things constantly, has poor concentration and disjointed thoughts, and is germ-phobic, depressed, overwhelmed, and easily rattled. Id. Overall, she felt about the same. Id.

On September 22, 2008, the Plaintiff visited Dr. Walker. (R. at 386) She was medication compliant but continued to report significant obsessions and compulsive behaviors. Id. She was

getting out of the house but has a great deal of difficulty due to her anxiety.  Id.  She reported that her son may have fathered a daughter, and that they were arranging for DNA testing to determine if the child belongs to his son.  Id.  She continued to worry constantly but was getting some relief from the Luvox.  Id.

The Plaintiff was seen by Dr. Walker on October 1, 2008.  (R. at 385)  She was medication compliant; however, Dr. Price switched her medications to Lexapro, which she could not get approved by her insurance company.  Id.  She continued to wash her hands repeatedly during the day and was worried about germs and bacteria.  Id.  She further stated that she had been in contact with the woman claiming to have born a child by her son and that she would be depressed if she finds out she is not a grandmother.  Id.

On October 15, 2008, the Plaintiff visited Dr. Price, reporting that her mood was brighter and that she was going to bed early.  (R. at 400)  However, she reported that her OCD was worse.  Id.

The Plaintiff visited Dr. Kubicki on October 20, 2008.  (R. at 392-94)  He reported that the Plaintiff had persistent obsessive compulsive symptoms that defied treatment.  (R. at 392)  He noted that her depression had significantly improved with Luvox and that she controlled her anxiety with Xanax.  Id.

On October 21, 2008, the Plaintiff visited Dr. Walker.  (R. at 384)  She was medication compliant and reported that Dr. Price increased her medications because Lexapro was not covered by her insurance.  Id.  She continued to talk about the death of her oldest son and imprisonment of her youngest son, and about spending time with a child that may be her granddaughter.  Id.  She reported significant compulsive behavior relating to parking her car, and Dr. Walker instructed her

to not follow those compulsions prior to getting out of the vehicle.  Id.

On November 12, 2008, Dr. Price reported that the Plaintiff's son was going back to prison, and that she was unsure if he had a child.  (R. at 399)

On December 9, 2008, Dr. Walker saw the Plaintiff for a checkup.  (R. at 383)  She reported that her medications were not working very well, and that she planned to see Dr. Price on December 10th for a re-evaluation.  Id.  She had been very upset about her son's incarceration, and she was also uncertain about whether the child she has been watching is related to her.  Id.  She reported depression surrounding her family issues and the fact that the holidays were approaching.  Id.  She did not have suicidal plans or ideations.  Id.

The Plaintiff visited Dr. Price on December 10, 2008.  (R. at 398)  She reported more more depression, and she was still constantly checking things.  Id.

The Plaintiff visited Dr. Walker on December 30, 2008, for a checkup.  (R. at 382)  She was doing somewhat better with her obsessive compulsive disorder but continued to exhibit compulsive behavior.  Id.  She was still very worried about her imprisoned son, and depressed about the death of her older son.  Id.  She reported doing some activities with her roommate but very little activity outside the home.  Id.

On February 13, 2009, the Plaintiff visited Dr. Walker, reporting that bad weather, combined with her mental state, had prevented her from coming in for an appointment.  (R. at 381)  She was further disturbed by the recent death of an ex-husband, along with lingering thoughts about her two sons.  Id.  She reported doing well for awhile and then her depression would get worse and she would become tearful on most days.  Id.  Dr. Walker noted that the Plaintiff planned on some

activities for the spring but that her compulsive behaviors made it difficult for her to accomplish tasks. Id.

On March 6, 2009, the Plaintiff visited Dr. Walker, stating that she was having a great deal of difficulty coping with the family problems she has had over the years. (R. at 380) She continued to express hope for the arrival of springtime, when she is more active and less depressed. Id. She continued to count things and was compulsive in her behavior but was trying to manage her condition. Id.

On March 27, 2009, the Plaintiff reported to Dr. Walker that her compulsive behavior had worsened, and that she was repeating things out loud constantly throughout the day. (R. at 379) She stated that she had not informed Dr. Price of this development. Id. Dr. Walker did inform Dr. Price, hoping that he would adjuster her medication to help with her behavior. Id.

Dr. Price reported on April 8, 2009, that he had discontinued the Plaintiff's Luvox and prescribed her Prozac. (R. at 397) Her OCD was still out of control, and she was having more nightmares. Id. She had also gained weight and was eating more. Id.

On April 28, 2009, the Plaintiff visited Dr. Walker, reporting that her medication had been changed from Luvox to Prozac. (R. at 378) She still reported compulsive behavior, but stated that she tried very hard to control those behaviors. Id.

The Plaintiff visited Dr. Price on June 3, 2009. (R. at 396) He reported that the Prozac helped initially, but was still checking things. Id. He also reported that her son was sentenced to 12 years in prison, and that she tried to hang herself. Id.

On June 8, 2009, the Plaintiff met with Dr. Walker for treatment. (R. at 377) His notes state

that the Plaintiff continued to take Prozac but still had symptoms of obsessive-compulsive disorder, which she had a great deal of difficulty addressing even with behavior modification strategies. Id. He encouraged her to stay active and increase her activities, noting that she does better in the summer when she is more active. Id.

On August 25, 2009, Dr. Walker wrote a letter to the Plaintiff's attorney, providing an opinion on her mental state and her fitness for work. (R. at 407-08) Dr. Walker reported that the Plaintiff was awake, alert, and oriented in all three spheres. (R. at 407) She was depressed and anxious, but denied auditory or visual hallucinations or delusions and denies any suicidal ideation or plan. Id. She had been treated by Dr. Walker for 1.5 years and was also being treated by Dr. Price, a psychiatrist. Id. Her short and long-term memory were intact and her speech has always been very pressured. Id. Her insight, judgment, and concentration were poor to fair. Id. She was extremely anxious and constantly exhibited behaviors for obsessive-compulsive disorder, such as counting and arranging things. (R. at 408) He further stated that she is unable to leave her home other than to go to doctors' appointments, and she cannot go into any type of public building or facility. Id. He stated that the Plaintiff was originally referred to him to help her deal with the death of her son, but that during the process of psychotherapy it became evidence that she suffered from severe obsessive-compulsive disorder. Id. Dr. Price tried several different medications, including Luvox and Prozac, to control her OCD symptoms, but she still had symptoms and was depressed. Id. She was restricted in her activities of daily living because she does not function in any social situation other than with her boyfriend or her son, she does not go to public places, and has trouble going to Dr. Walker's office. Id. He states that the behavior has been ongoing for many years, and

that in his opinion there is no possible way that the Plaintiff can maintain any gainful employment because she would be unable to go to her workplace, would be unable to function once she arrived, and would be unable to handle stress or social interaction.  Id.

E.      Testimonial Evidence

At the ALJ hearing held on September 1, 2009, the Plaintiff initially moved to withdraw her Title II claim and amend her onset date to February 7, 2007.  (R. at 39-40)  These motions were granted by the Court.  (R. at 39-40)

The Plaintiff testified that she worked full-time in 2003-2004 for Marsh Bellofram corporation, performing various "floating" tasks in the company's manufacturing plant.  (R. at 44)  She was forced to quit after accumulating too many absences from work.  Id.

The Plaintiff first sought treatment for her mental health problems in February 2007 following the death of her son.  (R. at 45)  She has troubles with being nervous, must count and check stuff constantly, and has a problem being around people.  Id.  She cleans her home from the time she wakes up until the time she goes to sleep, taking a few hours off to use the bathroom or watch television.  (R. at 45-46)  She stated she likes to clean.  Id.  She washes her hands a lot – sometimes as much as ten times an hour – and takes several minutes to do so.  (R. at 46)

The Plaintiff has several rituals that she undergoes due to her mental impairments.  She stated that if she leaves a room, she must turn the light off roughly six times, sometimes even revisiting the room to make sure the light is still off.  (R. at 47)  Whenever she leaves the house, she checks her washer and dryer, opening the doors to make sure there are no fires inside of the lint trap.  Id.  She has to check the burners on the stove, the lights in the house, the bubbles in her fish tank,

the water spigots, and the toilets to make sure everything is turned off and ensure that her fish tank is running properly. Id. It takes her a long time to cook because of her need to check things. (R. at 51)

The Plaintiff is afraid to touch batteries, or any small objects containing batteries (such as a flashlight), because of battery acid. (R. at 48) She is afraid to touch bugs, broken glass, and snakes. Id. She is afraid to leave her house by herself or drive. Id. She does, however, drive 30 minutes every day to take her friend to work, but does not make any stops at stores by herself. Id.

The Plaintiff admitted trying alcohol and marijuana "a long time ago," around the age of 18 or 20. (R. at 57) She has had a couple beers since her son died, and she drinks on some Saturday nights but does not leave the house. Id.

The Plaintiff was treating with Dr. Price once a month, and Dr. Walker once every two months, or in some instances twice a month. (R. at 57-58) She first reported her obsessive checking behaviors to Dr. Walker in May 2008. (R. at 58) She claims, however, that she has suffered from these behaviors for all of her life, and attempted to hide them until recently when Dr. Walker found out. Id. The symptoms have grown worse since the death of her son. (R. at 59) She stated that she has been afraid of getting treatment because she fears being locked up involuntarily. (R. at 59-60) She stated that the reason she was able to work before diagnosis but unable to work now is that her symptoms are much worse and that she is now much more nervous. (R. at 66-67) She also stated that she could not handle a job cleaning, despite the fact that she enjoys the activity, because she would have to do the job her way and would likely spend time on her compulsions. (R. at 67, 70)

Next, the Plaintiff's friend and roommate, Phillip Lyons gave testimony, stating that he has

known the Plaintiff for six or seven years. (R. at 71-72) They have lived together for most of that time. (R. at 72) He stated that she spends very little time around other people other than him, and might spend 15-30 minutes with her relatives. Id. He takes care of her, allowing her to live in his home for free. (R. at 78)

Mr. Lyons stated that when the Plaintiff constantly cleans things, including her hands and counters, and repeatedly turns light switches on and off. (R. at 72) She will clean counters and stove tops multiple times, and if someone spills something she will clean the entire surface rather than just the area of the spill. (R. at 73) When she leaves a room and turns the lights off, she will re-enter the room several times to make sure that the lights are off. (R. at 72-73) She has a habit of counting dates, where she will count out loud the months and days between different spans of time; for example, if someone was born in 1977 and died in 2009, she will obsessively count off the time period. (R. at 73) She has trouble with washing her hair, and will go for several days at a time before she washes her hair. (R. at 73-74)

Mr. Lyons testified that the Plaintiff rarely leaves the house without him, and only for doctors appointments. (R. at 74) He said that she would occasionally go to pick up small things from the store, like a jug of milk, and has done so as recently as one month prior to the hearing. Id.

Mr. Lyons stated that when the Plaintiff comes home, she must hang her purse, keys, and shoes in a specific place. (R. at 75) When she leaves the home, she has to make sure the coffee pot is unplugged and certain lights are turned out, which can take her 10-15 minutes. Id. She occasionally runs 25-30 minutes late when picking Mr. Lyons up from work. Id.

Following the conclusion of Mr. Lyons' testimony, Eugene Czuczman, an impartial

vocational expert, was sworn and gave testimony.  (R. at 80-88)  Mr. Czuczman identified that his

testimony would concern a region comprised of the state of West Virginia and its five metropolitan

areas: Charleston, Huntington, Morgantown, Parkersburg, and Wheeling.  (R. at 81)

The Plaintiff's past relevant work combined the roles of parts tester, which is light semi-

skilled work, and parts picker, which is medium unskilled work.  (R. at 81)  The Plaintiff also has

past relevant work as a waitress, which is light semi-skilled, a container finisher, which is light

unskilled, and a motel clerk, which is light semi-skilled.  (R. at 82)  She performed all of these jobs

as they are customarily performed.  (R. at 82-83)

The ALJ then posed a series of hypothetical RFCs to Mr. Czuczman to determine if there

was work available in the economy that the Plaintiff could perform:

> Q.     [F]or RFC number one I want you to assume that Ms. Smith has the ability
> to perform medium exertional work as defined by statute.  . . . .  For
> exertional limits for RFC number one there are no physical exertional limits,
> and that would include no postural limits, no environmental limits.  . . . .  For
> RFC number one there are also no mental limits.  So if you make the
> assumption under RFC number one that there are no physical or mental
> limitations, the first question to you, sir, is would there be – would Ms. Smith
> be able to perform any of her past work?
>
> A.     She would be capable of performing all her past work.
>
> Q.     Okay.  Then for RFC number two I want you to assume that there are no
> physical limitations, but I'm going to now talk to you a little bit about mental
> limitations. . . . .  For mental limitations under RFC number two I want you
> to assume that work would be limited to simple – and I'm going to define
> that as one- to three-step tasks.  That are routine and repetitive in nature.
> Performed in a low pressure, low stress work environment.  And I'm going
> to define that as free from fast paced production or strict production quotas.
> I'm also going to define low pressure and low stress as only occasional
> changes in the workplace.  I want you to also assume that there's some
> limitation socially, and so there should only be occasional interaction with

the public, supervisors, and/or coworkers. If you make those assumptions under RFC number two the first question to you, Mr. Chuchman, is would [sic] Ms. Smith be able to perform any of her past work?

A.     No, Your Honor.

Q.     Since she could not go back to her past work, would there be other jobs taht she could perform that would be within the limitations of RFC number two?

A.     Folding or light unskilled and fit within the hypothetical as given. Folding machine operator, Dictionary of Occupational Title 208.685-014. There are 75,000 national, and for the region there are 300. Medium, unskilled, recognized under Dictionary of Occupational Title 509.686-018 as a scrap sorter. 60,000 national, 100 regional. Heavy exertional, unskilled, lumber stacker recognized under DOT 922.687-070. 75,000 national, 600 for the region. And that is a sampling, Your Honor.

Q.     Okay. For RFC number three I want you to assume an environmental limitation in addition to the mental limits that were provided in RFC number one. So essentially, RFC – I'm sorry – mental limits in RFC number two. So the mental limits in RFC number two carry over into RFC number three. And I want you to assume that under RFC number three that work should preferably be in a controlled environment. To avoid concentrated exposure to environmental irritants such as fumes, odors, dust, and gases. And that's in part because of the obsessive compulsive disorder. Well that is because of the obsessive compulsive disorder which often is triggered by dirt and those kinds of things. If you make the assumption under RFC number three that that environmental limitation adds, would the jobs of folding machine operator, scrap sorter, and/or lumber stacker still exist?

A.     The scrap sorter and the lumber stacker would be eliminated for that reason. However, a folding machine operator would remain.

Q.     Would the numbers that you provided to us for the folding machine operator be reduced in any way under RFC number three?

A.     No, Your Honor.

Q.     Because the jobs of scrap sorter and/or lumber stacker have been eliminated, would there be alternate jobs that you could offer under RFC number three?

A.     Linen room attendant which is medium, unskilled. Recognized under DOT 222.387-030. 80,000 national, 500 regional. Sedentary, unskilled as an addressing clerk is recognized under DOT 209.587-010. Yeah, sedentary, unskilled. 70,000 national, 500 regional. And that is a sampling, Your Honor.

Q.     Okay. For RFC number four I want you to assume RFC number three in its entirety, but I'm going to make a change in the social limits.

A.     Okay.

Q.     Instead of occasional interaction with the public, I want you to presume no interaction with the public. If you make that change and assumption under RFC number four would the jobs of folding machine operator, linen room attendant, and/or addressing clerk still be available?

A.     Yes, it would be.

Q.     Would there be any reduction in the numbers you've already provided with the new limitation in RFC number four?

A.     No.

Q.     Let me take a look at one other thing. For RFC number five I want you to assume RFC number four in its entirety, but I'm going to make another social change. In addition to no interaction with the public, I want you to assume that there should be no tandem tasks with coworkers. And that preferably work should be isolated when possible. If you make that assumption under RFC number five, would the jobs that you've identified for RFC numbers three and four – those being folding machine operator, linen room attendant, and/or addressing clerk – still be available?

A.     Yes, they would be.

Q.     Would there be any reduction in the numbers that you've already provided because of the new limitations in RFC number five?

A.     No.

Q.     For RFC number six I want you to assume that all the testimony that you heard today from both Ms. Smith and Mr. Lyons would be deemed fully

credible about her complaints and functional limitations. And I'm just going to identify a couple of them. I'm not going to repeat all the testimony because it was extensive. But for example, Ms. Smith takes a minimum of 10 to 15 minutes to leave her house, sometimes takes her 25 to 30 minutes to do so. She engages in checking behaviors such as checking lights, checking the dryer, checking stove burners, fish bubbles, water spigots, and so forth before she leaves the house. She washes her hands sometimes two to ten times per hour. She has difficulty concentrating. She does not like to be around people, especially folks she does not know. And I'm sorry, I misstated that. She's nervous around a lot of people. Excuse me. And she feels like there is a war in her head at times. If you make the assumptions of credibility regarding this testimony and all the other testimony that was provided, and you assume that it is supported by the medical evidence, would there be any occupations that Ms. Smith could perform, either that we've discussed or otherwise.?

A.   No, Your Honor. And one of the reasons why I'm looking at is she's washing her hands up to ten times every hour. She's going ot be off task during that period of time. It's going ot be disruptive for any employer. In addition, the testimony that she's late for appointments, picking up her friend by 20 minutes. If she'd show up every day to work 20 minutes late, they're going to end up firing her.

(R. at 83-88) Mr. Czuczman advised the ALJ that his testimony was consistent with the information found in the Dictionary of Occupational Titles, and that his workforce numbers were based on his own experience and on labor market surveys. (R. at 88)

F.   Lifestyle Evidence

The Plaintiff currently lives with a friend, Philip Lyons, and stays for free in his home. (R. at 78) She lives on food stamps, and her roommate pays all of the bills. (R. at 68-69) She stated on an adult function report that she wakes up at 2:30 AM to drive Mr. Lyons to work, then returns home and begins cleaning the house. (R. at 229) She stops to take a bath, then cleans more until it is time to pick Mr. Lyons up from work. Id. She eats once a day, and usually eats frozen

microwaveable food. (R. at 231) Prior to going to bed, she watches some television and tries to read the newspaper. (R. at 203, 229) She claims to have terrible nightmares that make it hard to sleep, but also states that she has good dreams. (R. at 203, 230)

The Plaintiff enjoys cleaning, and spends hours each day both cleaning and doing laundry. (R. at 231) She describes cleaning as her hobby, and believes she does a pretty good job. (R. at 233) She looks forward to the springtime, when she can pull weeds in the back yard and spend time with her two dogs, who live in the yard behind the house. (R. at 62, 231) She stated that she gives food and water to the dogs on occasion, but that Mr. Lyons usually cares for them. (R. at 230) She also cares for a pet bird. (R. at 204)

The Plaintiff goes outside 2-3 times a day, and can drive but only does so when she has to because it makes her nervous. (R. at 232) She shops once a week for food and cleaning supplies, spending about 45 minutes in the early morning at Walmart. Id.

As far as social activities, she spends time with Mr. Lyons only, but does talk to her family over the phone. (R. at 207, 233) She goes to the store with him and talks with him. Id. She does occasionally shop, and attend doctors' appointments, but otherwise does not go anywhere on a regular basis and does not like leaving her house or yard. (R. at 233-34) Sometimes, she needs Mr. Lyons to accompany her when she leaves the home. (R. at 233) She did, however, report to Dr. Golas that she gets out to eat twice a month. (R. at 284)

### III. CONTENTIONS OF THE PARTIES

The Plaintiff, in her motion for summary judgment, alleges that the ALJ's decision is not supported by substantial evidence. erred in failing to assign controlling weight to the opinions of her

treating physicians.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. 9-13, ECF No. 17)  Specifically, the

Plaintiff alleges that the ALJ:

- failed to assign controlling weight to the opinions of her treating physicians, which directed

  a finding of disability under Listing 12.06; and

- improperly found that she and her roommate were not credible regarding the intensity,

  persistence, and limiting effects of her symptoms.

Id. at 10-14.  The Plaintiff believes that the ALJ should have found the Plaintiff disabled under the

listings, or should have formulated her RFC differently.  Id. at 11, 14-15.  The Plaintiff requests that

the Court reverse the decision of the Commissioner and award benefits or, alternatively, remand the

case for a new hearing.  Id. at 15.  In contrast, the Defendant alleges in his motion for summary

judgment that the decision denying the Plaintiff's claim for DIB benefits is supported by substantial

evidence and should be affirmed as a matter of law.  (Def.'s Mot for Summ J.1, ECF No. 18)  The

Defendant argues that substantial evidence supports the ALJ's finding that the Plaintiff's onset date

was August 27, 2008, and that her mental impairments failed to meet the requirements of a listing.

(Def.'s Mem. in Supp. of Mot. for Summ. J. 9-14, ECF No. 19)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in

a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as
> to any fact, if supported by substantial evidence, shall be conclusive . . . ." );
> Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v.

Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.     Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A).  The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
>
> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520.  If the claimant is determined to be disabled or not disabled at any of the five

steps, the process does not proceed to the next step.  Id.

B.      The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

**1.      The claimant met the insured status requirements of the Social Security**

**Act through December 31, 2004.** (R. at 12)

2.   **The claimant has not engaged in substantial gainful activity since September 27, 2007, the Title XVI application date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).** (R. at 12)

3.   **Beginning August 27, 2008, the claimant has the following severe impairments: major depressive disorder; obsessive-compulsive disorder; and history of polysubstance abuse (alcohol and marijuana) (20 CFR 404.1520(c) and 416.920(c)).** (R. at 13)

4.   **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).** (R. at 14)

5.   **After careful consideration of the entire record, the undersigned finds that, beginning August 27, 2008, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she must work in a controlled environment to avoid concentrated exposure to environmental irritants such as fumes, odors, dust and/or gasses; is limited to work involving simple (e.g., one - to three-step), routine and repetitive tasks performed in a low pressure/stress work environment (free from fast paced production or strict production quotas); must have only occasional changes in the workplace; and must have only occasional interaction with the public, supervisors, and co-workers.** (R. at 16)

6.   **Beginning August 27, 2008, the claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).** (R. at 22)

7.   **The claimant was born on May 23, 1964, and was 43 years old, which is defined as a younger individual, on the application date (20 CFR 404.1563 and 416.963).** (R. at 23)

8.   **The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).** (R. at 23)

9.   **Transferability of job skills is not an issue because the claimant's past**

**relevant work is unskilled (20 CFR 404.1568 and 416.968).** (R. at 23)

10. **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a))** (R. at 23)

11. **The claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).** (R. at 24)

C. <u>Substantial Evidence Supports the ALJ's Decision to Not Assign Controlling Weight to the Opinions of the Plaintiff's Treating Physicians</u>

The Plaintiff's first assignment of error is that the ALJ should have assigned controlling weight to the opinions of her treating physicians. (Pl.'s Mem. in Supp. of Mot. for Summ. J. 10, ECF No. 17) Specifically, the Plaintiff challenges the ALJ's decision to accord less than controlling weight to the opinion of Dr. Walker,[3] who opined that the Plaintiff suffers from a lifelong obsessive-compulsive disorder ("OCD") that is particularly resistant to treatment, as well as extreme anxiety exacerbated by the death of her son in January 2007. <u>Id.</u> Ultimately, the Plaintiff argues that the ALJ should have found her disabled under Listing 12.06 based on Dr. Walker's opinion. (Pl.'s Mem. in Supp. of Mot. for Summ. J. 11, ECF No. 17) The undersigned Magistrate Judge finds the Plaintiff's arguments to be without merit because the opinions of the Plaintiff's treating physicians are not supported by medically acceptable clinical diagnostic techniques and are inconsistent with evidence of her past employment and daily activities.

_____

[3] The Plaintiff's motion erroneously refers to Dr. Walker in various portions of her brief as "Dr. Wallace." The Court notes that the record does not contain any medical records from a Dr. Wallace, and the Plaintiff's citations refer to the treatment records of Dr. Walker.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(d). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Dr. Walker's opinion fails the first prong of the treating physician analysis because it is unsupported by medically acceptable clinical or laboratory diagnostic techniques. All of Dr. Walker's notes demonstrate that his diagnoses are based solely on the Plaintiff's own self-reported symptoms,[4] and the record lacks any indication that Dr. Walker – or either of the Plaintiff's other two treating physicians – performed any psychological tests to confirm her subjective complaints. In fact, the only in-depth mental profile contained in the record was performed Dr. Golas, who did not record any self-reported or objective signs of OCD and observed that the Plaintiff's mood was

---

[4] Each of Dr. Walker's notes state that his treatment goals were for the Plaintiff to stop reporting symptoms of anxiety, depression, and OCD, and the contents of his treatment notes detail the Plaintiff's activities outside of the clinical setting rather than Dr. Walker's own observations.

"mildly anxious but appropriate to the situation and setting."[5]  (R. at 280)

Dr. Walker's opinion also fails the second prong of the treating physician analysis because his opinion is inconsistent with other substantial evidence in the record.  Dr. Walker claims that the Plaintiff is "essentially unable to leave her home other than to go to a doctors appointment.  She cannot go into any types of public buildings or facilities."  (R. at 408)  However, the Plaintiff herself admits to a variety of daily activities conducted outside the home, reporting that she drives her roommate to work and picks him up every day, leaves the house 2-3 times every day, shops weekly at Walmart, goes out to eat twice a month, and spends time working in her back yard during the spring and summer.  (R. at 204, 206, 229, 232, 284)  The Plaintiff admitted that she can perform all of these activities alone, including attending her doctor's appointments.  (R. at 207, 233)  The Plaintiff's work history also belies any notion that "[s]he would be unable to go to her workplace and would not be able to function once she arrived.  She would have a great deal of difficulty with any type of social interaction and can handle no stress whatsoever."  (R. at 408)  The Plaintiff worked for an entire year in a large factory owned by Marsh-Bellofram and, surprisingly, worked as a waitress for nearly 10 months – a job which involves direct and constant interaction with the public in a fast-paced and high stress environment.  (R. at 211)

The ALJ had a duty to explain the weight given to Dr. Walker's opinion with enough specificity to allow for this Court to determine the basis of his decision.  See " SSR 96-2p, 1996 WL

---

[5] The Plaintiff's brief points out that the Plaintiff scored in the "extreme" range of anxiety on the Burns Anxiety Inventory administered by Dr. Golas.  (R. at 283)  However, the Court notes that Dr. Golas's report states that the score is based on the Plaintiff's own responses, and her score contradicts his observations of "mild anxiety" during the assessment.

374188, at *5 (July 2, 1996). The ALJ fulfilled that duty by assigning little weight to Dr. Walker's opinion based on substantial inconsistent evidence of the Plaintiff's daily activities and work history. Although the Plaintiff would ask this Court to read the record differently than the ALJ and draw different conclusions from the evidence, the duty of resolving conflicts in the evidence belongs to the ALJ alone. Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) Accordingly, the undersigned Magistrate Judge finds that substantial evidence supports the weight assigned to Dr. Walker's opinion.[6]

D.     Substantial Evidence Supports the ALJ's Credibility Determinations

The Plaintiff next argues that the ALJ failed to properly weigh the testimony of the Plaintiff and her roommate, Philip Lyons. (Pl.'s Mem. in Supp. of Mot. for Summ. J. 14, ECF No. 17) The Plaintiff claims that the ALJ's only rationale for discounting her testimony and Mr. Lyons's testimony is the fact that she did not seek treatment for OCD until after she filed for benefits. Id. She further argues that her OCD symptoms worsened after the death of her son. Id. While the timing of the Plaintiff's development of OCD symptoms was a role in the ALJ's decision, the undersigned Magistrate Judge finds that the ALJ conducted an extensive review of the evidence and found that the Plaintiff's subjective complaints were also contradicted by her daily activities and medical records.

The determination of whether a person is disabled by pain or other symptoms is a two step

_____

[6] In regard to the Plaintiff's assertion that controlling weight should have been assigned to Dr. Walker's opinion that the Plaintiff meets the criteria of Paragraph B of Listing 12.06, the Court finds that controlling weight can never be assigned to such an opinion as it is on an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(e).

process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of symptoms alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations in light of the entire record.  See Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984).  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"  Sencindiver v. Astrue, Civil Action No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D.W.Va. February 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

First, the ALJ's opinion cites a number of the Plaintiff's medical records indicating that, despite her claims of lifelong debilitating mental problems, her symptoms either did not exist at certain times or were not as severe as she or her roommate claimed:

•       On December 18, 2007, the claimant reported feeling a little bit better regarding her anxiety, did not appear overly depressed, did not allege any OCD symptoms, and had seen a psychologist and liked the experience;  (R. at 18)

•       On January 21, 2008, the claimant did not allege any OCD symptoms, listing only thyroid problems, depression, and anxiety as her complaints.  Her mood was mildly anxious, her insight was fair, her judgment was average, she had no delusions, preoccupations, obsessions, phobias, illusions, hallucinations, or depersonalization.  Her remote memory was mildly deficient but her immediate and recent memory, and her concentration, were within

normal limits. Her IQ was normal. The evaluator reported diagnoses of generalized anxiety disorder and major depressive disorder, recurrent, moderate; however, he also reported that she engaged in substantial daily activities and further noted that her social functioning, concentration, persistence, pace, immediate memory, and remote memory were all within normal limits and noted no functional problems. (R. at 18-19)

- The Plaintiff's treating psychologist diagnosed her on January 15, 2008, with adjustment disorder with mixed anxiety and depressed mood, but that diagnosis was not endorsed by her treating psychiatrist or the state agency psychological consultant that reviewed her claim. He also reported that she felt better since her thyroid medication was increased and reported keeping busy. (R. at 19)

- On March 17, 2008, the Plaintiff's primary care physician reported that she was doing fairly well. (R. at 19)

- On September 22, 2008, the Plaintiff reported that she was getting out of the house more and was arranging DNA testing to determine if a child was her grandchild. (R. at 20)

- On October 15, 2008, the Plaintiff reported that her symptoms were worse but her psychiatrist noted that her mood was brighter. (R. at 20)

- On February 16, 2009, the Plaintiff had no complaints at the time of a "well" examination by her primary care physician. (R. at 20)

- On June 8, 2009, the Plaintiff's psychologist noted that she still had OCD symptoms but that she should increase her activities because she did better when she was more active. (R. at 21)

Although the ALJ's opinion acknowledges that the record contains medical evidence indicating more severe symptoms, it is up to the ALJ to resolve any conflicts in the evidence. <u>Hayes v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

Second, despite the Plaintiff's testimony and her roommate's testimony that she suffers from disabling mental limitations, the ALJ concluded that her activities of daily living evidenced that her symptoms were not as disabling as claimed. At various points in the record, the Plaintiff's testimony, medical records, or application forms indicate that she conducts significant activities on a daily basis, such as driving her roommate to and from work, leaving the house 2-3 times per day, reading the newspaper, feeding and watering her dogs and bird, preparing meals, cleaning and doing laundry, doing yard work, driving a car, shopping for food and cleaning supplies, attending doctor's appointments, going out to eat twice a month, and talking to her family on the telephone. (R. at 22, 204, 206, 229, 232, 284)

Third, in resolving the conflicting evidence, the ALJ found it significant that the Plaintiff alleged lifelong OCD problems, yet failed to show any symptoms of the disease until over a year after the death of her son and a year after beginning mental health treatment. The Court agrees with the ALJ that the lack of evidence of OCD symptoms prior to May 2008, despite the fact that the Plaintiff was receiving regular treatment from not one but three different physicians, undermines her claim that she has suffered from OCD her entire life. (R. at 58) Even Dr. Walker's notes state that "[s]he never indicated any compulsive behaviors in the past." (R. at 343) While the Plaintiff attempts to explain the lack of past OCD symptoms on her "compulsive and illogical behavior," the Plaintiff's argument begs the question as to why all three of her treating physicians failed to

recognize this same compulsive and illogical behavior at any point during the first year of her treatment. The undersigned agrees with the ALJ that the timing of the Plaintiff's development of symptoms is more likely tied to the initial denial of her benefits claim – which occurred three months prior to her first reports of OCD symptoms – than to the death of her son, which occurred more than a year earlier.

After reviewing the evidence, it is clear that while there is substantial evidence to support the Plaintiff's subjective complaints, there is also substantial evidence indicating the opposite. The undersigned Magistrate Judge cannot say that the ALJ's resolution of the evidence in this case is "patently wrong," and accordingly finds that the ALJ supported his credibility determinations with substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits. Accordingly, I recommend that the Plaintiff's Motion for Summary Judgment (ECF No. 16) be **DENIED**, the Defendant's Motion for Summary Judgment (ECF No. 18) be **GRANTED**, and the Decision of the Administrative Law Judge be affirmed and this case **DISMISSED WITH PREJUDICE**..

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **28th** day of **April**, **2011**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE